IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,       )
                                )
        v.                       )          No. 3:13-CR-123-TAV-JEM
                                )
KELLY LOUISE FITZMAURICE,        )
                                )
                Defendant.       )

## MEMORANDUM AND ORDER

This case came before the Court on the Government's motion for detention and
Defendant's request for a preliminary hearing in accordance with the Federal Rules of Criminal
Procedure and the applicable provisions of the Bail Reform Act, 18 U.S.C. § 3143(a)(1).

## I.    BACKGROUND

In 2014, Defendant pleaded guilty to the distribution and possession of child pornography,
in violation of 18 U.S.C. § 2252A(a)(2), (a)(5)(B), (b)(1), (b)(2) [Doc. 26 p. 1]. She was sentenced
to 151 months' imprisonment followed by fifteen years' supervised release [*Id.* at 2–3]. After
serving her term of imprisonment, she began her term of supervision on September 12, 2024
[Doc. 41]. In relevant part, the conditions of her supervised release provide that Defendant shall
(1) "not commit another federal, state, or local crime[;]" (2) "answer truthfully all inquiries by the
probation officer and follow the instructions of the probation officer;" and (3)

> not associate and/or be alone with children under 18 years of age, nor shall
> he/she be at any residence where children under the age of 18 are residing,
> without the prior written approval of the probation officer. In addition, the
> defendant shall not visit, frequent, or remain *about any place that is
> primarily associated with children under the age of 18, or at which children
> under the age of 18 normally congregate, without the prior written approval
> of the probation officer.*

[Doc. 26 pp. 3–4 (emphasis in original)]. On May 27, 2025, District Judge Thomas A. Varlan issued a warrant for Defendant's arrest based on a Petition for Warrant for Offender Under Supervision [Doc. 41]. Defendant initially appeared on the Petition on May 28, 2025 [Doc. 42]. The Government moved for detention, and Defendant requested a preliminary hearing and a detention hearing.

## II.     HEARING SUMMARY

The parties appeared before the undersigned for a preliminary hearing and detention hearing on June 9, 2025.[1] Assistant United States Attorney Frank Dale appeared on behalf the Government. Assistant Federal Defender Benjamin Sharp represented Defendant, who was also present. AUSA Dale introduced the Petition [Exh. 1], which was submitted to the Court by United States Probation Officer Robert C. Welch, II, and the Presentence Investigation Report as revised on May 19, 2014 [SEALED Exh. 2]. AUSA Dale called Officer Welch to testify. Mr. Sharp introduced text messages between Officer Welch and Defendant [Exh. 3] and a collection of photographs of her brother's property where Defendant resides [Exh. 4]. Assistant Federal Defender Sharp called David Fitzmaurice, Defendant's brother, to testify.

### A.     Testimony of Officer Welch

AUSA Dale asked Officer Welch a series of questions about his communications with Defendant, the conditions of her supervised release, and her residence. Officer Welch testified that at the start of her supervised release, Defendant told him she was residing with her brother, David Fitzmaurice, and that he has a minor child with whom he has random contact. Officer Welch asserted that he read the conditions to Defendant word-for-word, suggested that she review them

---

[1]     At Defendant's initial appearance, the Court scheduled the hearings for June 3, 2025 [Doc. 45]. The Court subsequently continued the hearings because Defendant had been admitted to the hospital [Doc. 47].

with her brother, and offered to answer any questions the next time he saw her. Officer Welch stated "she was informed on numerous occasions that she was not allowed to be at the property if the child was there. If for some reason the child showed up or she came home and the child was there, she was to leave immediately." Officer Welch stated that he was told that Mr. Fitzmaurice is a registered sex offender.

AUSA Dale then prompted Officer Welch to describe the home visit that he conducted on May 27, 2025. Officer Welch explained that he visited Mr. Fitzmaurice's property. When he drove onto the property, he observed Defendant in an open tool shed or garage and a minor child within a few feet from her. He stated the child was Mr. Fitzmaurice's three-year-old daughter. Officer Welch observed for a "few seconds," exited his vehicle, and continued to observe for "a period of time." He watched Mr. Fitzmaurice walk across the yard and approach Defendant. It appeared to Officer Welch that Mr. Fitzmaurice said something to Defendant. Officer Welch saw Defendant look in his direction and heard her say "Oh shit David, I'm f****d" [*See* Exh. 1 p. 2].

AUSA Dale next asked Officer Welch about his conversation with Defendant after he observed this. He specifically asked whether Officer Welch asked Defendant if she had been alone with the child. Officer Welch agreed that he did. Officer Welch then explained that he asked, "why is she alone with a child," and Defendant stated in response that she "is not alone with the child." Officer Welch responded by informing her that he had observed her being alone with a child because he could not see another person, and she then stated that she was alone with a child.

AUSA Dale asked if Defendant stated that was the only time she had been alone with the child. Officer Welch testified that after further questioning, Defendant stated that on at least six occasions, the child had been at the residence while she was there; four of the times, the child stayed the night; and two of those times, she was completely alone with the child. Officer Welch

3

stated that this would violate the terms of release, as would being untruthful with him and engaging in conduct that would violate the requirements of the Tennessee Sex Offender Registry.[2] AUSA Dale inquired about any investigation of this conduct by the Department of Children Services. Officer Welch answered that there is an ongoing investigation.

AUSA Dale asked Officer Welch about the description of the offenses in the Presentence Investigation Report. In 2012, Defendant's online profile for a peer-to-peer file-sharing program stated "I'm a closet pedo I guess you can say. I love pthc and can't seem to get enough. Really seems to be an addition, lol" [SEALED Exh. 2 p. 5].[3] She told officers the type of content that she searched for [*Id.*].

Mr. Sharp questioned Officer Welch. He asked if Defendant had been in full compliance with the conditions from when he began supervising her in September 2024 until the home visit on May 27, 2025. Officer Welch stated that there were other instances of noncompliance that he did not include in the Petition.

Specifically, he testified that there was a fire at Mr. Fitzmaurice's home, and on January 22, 2025, Defendant relocated to an apartment in Johnson City, Tennessee (the residence of Mr. Fitzmaurice's girlfriend). Officer Welch stated that Defendant was not at the apartment when he conducted a home visit, and she informed him that the insurance company had paid for a hotel where she had been staying for a "few days." He informed her this was a sex offender registry violation because the hotel was across the street from a high school and a day care. He instructed her to leave the premises immediately.

---

[2]     Officer Welch did not identify any specific provisions of this law that Defendant allegedly violated.

[3]     This portion of the Presentence Investigation Report was read in open court.

4

On April 25, 2025, he attempted to visit Defendant at a hotel where she said she was residing. When he asked to confirm the room number, she informed him that as of April 11, 2025, she had been residing in a camper on her brother's property.

Officer Welch stated that she had not submitted any supervision reports as of December 2024. She lost the forms for the supervision reports in the fire and requested that he send more forms to her. He mailed her copies on February 3, 2025, and she did not return any. Officer Welch stated that Defendant told him she did not receive any forms. Mr. Sharp asked if he had told Defendant not to worry about the forms until he told her to, and Officer Welch agreed that he had.

Mr. Sharp then turned to the conditions imposed on Defendant's release, specifically "Special Condition: LR.83.10(b)(3)." In response to Mr. Sharp's question, Officer Welch confirmed that Mr. Fitzmaurice's child does not permanently reside at his property. He testified that he verbally informed Defendant that she could not be at the residence if the child was there. He stated he had not sought any modification of the conditions. It was his belief that that "any association" would include being at the residence with the minor child. Mr. Sharp asked Officer Welch whether a hypothetical individual on the sex offender registry who lived in an apartment building would be "associating" with a child who lived in a unit next door. Officer Welch stated that the hypothetical situation was a separate address, while in this instance, he observed Defendant within several feet of a child.

Mr. Sharp inquired about Officer Welch's visit to Mr. Fitzmaurice's property. He recalled that Defendant was standing at the edge of the shed, the vehicle was parked to the left where the grass and dirt road meet, and the child was in between the vehicle and Defendant [*See* Exh. 4 p. 1]. He stated that Defendant did not have her back to him, but she did not turn to look at him

5

until Mr. Fitzmaurice approached. He clarified that he observed from inside his vehicle for about thirty seconds, then another twenty or thirty seconds after he exited the vehicle.

Federal Defendant Sharp asked about a backhoe depicted next to the remains of the home that burned. Officer Welch stated that when he pulled in, he could see part of the equipment but did not really pay attention to it. Mr. Fitzmaurice told him that he had been sitting inside the backhoe, though Officer Welch did not see him. Officer Welch had been to the property once or twice since the home had burned down and was aware Defendant was living in a separate camper from her brother. Since the last time he visited, Defendant and her brother acquired a third camper. Officer Welch understood that Mr. Fitzmaurice planned to deed a portion of the property to Defendant and put the camper there to allow Defendant to have her own residence. AUSA Sharp asked if USPO approved that. Officer Welch stated "I can't tell him what to do with his property. But he was told that—because I believe his goal was to have more regular contact with his child— and that if that was going to be the case, to make things easier and safer for her, that she would need her own residence and property. So, he was going to deed a portion of that property to her so it could have its own address." Defendant had told Officer Welch that Mr. Fitzmaurice had started preparing for this but did not have a timeline for its completion.

Mr. Sharp asked Officer Welch about his communications with Defendant on May 27, 2025. Officer Welch stated that he verbally asked Defendant how many times her niece had been on the property and did not ask this in a text message. He stated that when Defendant answered that her niece had been on the property at least six times, she did not appear to be upset and was neither crying nor breathing heavily. He stated he asked for the child's name in a later text message.

Mr. Sharp introduced text messages between Defendant and Officer Welch from the day of the visit [Exh. 3]. In the text messages, he states, "I also don't want you going back to that

residence until I tell you you can. I'm gonna confirm the child is not there before you set foot back on the property" [*Id.*]. He asks Defendant, "[h]ow many times that you were there when the child was there did she spend the night with her father" and she responds, "4 or 5" [*Id.*]. He then asks why she has not been submitting the monthly supervised release reports. She says, "[t]he ones I had burned up in the fire. You said not to worry about them until you told me to" [*Id.*]. He responds that he mailed the forms a long time ago, and she answers that she did not receive them. He asks her where she is; she states that she is at a friend's house. Officer Welch asks if the friend has children and for the address, to which Defendant responds that the friend does not have children and provides the address. Officer Welch messages "I'm not gonna come to some random person's house to have this conversation. Meet me at the Walmart parking lot in Elizabethton" [*Id.*].

Mr. Sharp asked whether he first asked Defendant in person and again over text about the number of times she had been around her niece, and Officer Welch said, "yes." Earlier, he had not recalled that he sent the text. Officer Welch stated that he was on the property for around fifteen minutes total, instructed Defendant to leave the property, and followed her out to the main road. He confirmed that she later met him at the Walmart parking lot as he had requested.

Mr. Sharp inquired again about where Officer Welch observed Defendant, the child and Mr. Fitzmaurice on the property. Officer Welch stated that he did not see Defendant alone with the child in a structure and did not see her interact with the child. Mr. Fitzmaurice was on the property and arrived in "no longer than a minute." When Mr. Fitzmaurice approached, the child got into a toy car and drove away.

Mr. Sharp questioned Officer Welch about the investigation by the Department of Children's Services. Officer Welch stated that the most recent update he received was that the

investigation was ongoing. He knew that the Department had spoken to Mr. Fitzmaurice but was unaware they had gone to the property.

Mr. Sharp asked Officer Welch about the quote from Defendant that is included in the Petition. He clarified that this was from the Presentence Investigation Report and refers to Defendant's conduct in 2012 rather than her period of supervision.

On redirect, AUSA Dale asked Officer Welch to reread the condition that "[t]he defendant shall not associate and/or be alone with children under 18 years of age" [Exh. 1 p. 2]. Upon AUSA Dale's inquiry, Officer Welch confirmed that on May 27, 2025, Defendant told him she had been alone with the child on various occasions and had been at the property with just her and the child on at least two occasions.

Upon recross examination, Officer Welch agreed that he never saw Defendant and the child interact, that they did not have physical contact, and that they were not in the same room together. Officer Welch nonetheless testified that what he observed was, to him, being alone or having an association with a child. He reiterated upon questioning that previously, he had verbally instructed Defendant and her brother on numerous occasions not to be on the property with the child. He further stated that he did not seek any modification of her supervised release conditions because the special condition covers her being with the child in that instance.

### B. Testimony of Mr. Fitzmaurice[4]

Mr. Sharp asked Mr. Fitzmaurice about Officer Welch's visit to his home on May 27, 2025. Mr. Fitzmaurice testified that he was on the backhoe dumping insulation sheetrock into the dumpster [Exh. 4 pp. 1–2, 5]. The backhoe is about sixty or seventy feet from trailers on the

---

[4]     Defendant introduced a series of photos of Mr. Fitzmaurice's property, which were taken by Mr. Fitzmaurice, and Mr. Fitzmaurice referenced the photos throughout his testimony [Exh. 4]. The references in this section are to the page number(s) of the exhibit.

8

property [*Id.* at 4–8]. He had no trouble seeing anyone coming up the driveway, and he testified someone driving up the driveway would be looking directly at him where he was located that day. His daughter was there: she was in and out of the backhoe, on and off her toy vehicle [*id.* at 9], and running around the house. A friend had been there that morning, and another friend had left five minutes before Defendant and Officer Welch arrived.

Mr. Fitzmaurice explained Defendant had left the window down in her vehicle when it rained, so she borrowed his vehicle to go to appointments that day. After she could not complete one of her planned appointments, she stopped to buy a bag of ice and headed back to the residence. When she arrived back at the residence, Mr. Fitzmaurice testified that Officer Welch was not even two cars' lengths behind her. Defendant circled the yard and parked by the shed. When Defendant was putting ice in the cooler at the back of the shed, he said her back would have been toward Officer Welch. Officer Welch pulled in and came to a stop [Exh. 4 p. 1 (four-wheeler representing where Officer Welch parked)]. Mr. Fitzmaurice testified that Defendant was "oblivious" to Officer Welch's presence. He said that she was farther than fifty feet from his daughter while she was in the shed.

Because he had not recognized Officer Welch's vehicle, Mr. Fitzmaurice shut off the backhoe. Mr. Fitzmaurice immediately stopped his work and walked around to see who had arrived. He testified that his daughter got into her toy vehicle and drove around to see who had arrived as well. He greeted Officer Welch, grabbed his daughter, and walked around the yard. He did not recall saying anything to Defendant, though he testified that he heard the comment she made to him [*See* Exh. 1 p. 2]. In acknowledging that he heard Defendant's statement, he stated that Officer Welch "intimidates her."

9

Mr. Sharp asked about Mr. Fitzmaurice's status on the sex offender registry and the current investigation by the Department of Children's Services. He stated that he has a misdemeanor conviction for sexual misconduct in 2008 in New York and must comply with the requirements of the registry for another two years. As for the investigation, he told the state official that she could visit his home as soon as he was aware of who she was. The state official visited with his daughter at the residence the next day. When asked whether the official said anything suggesting the child not be around him, he testified that the official told him that if he was unfit, the child would be going with her that day; the official did not remove his daughter. Since then, Mr. Fitzmaurice has told the official about this Petition and that his daughter's mother was expecting to hear from the official about the investigation.

Mr. Sharp asked whether Defendant had been alone with his daughter since they had been living on the property in separate trailers. Mr. Fitzmaurice answered that no, Defendant has "never been alone with [his] daughter. Not one time, not ever." He said they have never slept in the same home; have never been under the same roof at the same time; and have no relationship. His said his daughter does visit periodically and has stayed overnight at the property in his camper four or five times. On those occasions, he said Defendant goes out to appointments or shopping; and either Defendant or Mr. Fitzmaurice and his daughter will spend the night at his girlfriend's residence. Mr. Sharp asked if it was unusual for Defendant and his daughter to be at the property together like they were on May 27. He said "yes, only in passing and in a situation like that."

Mr. Sharp then asked Mr. Fitzmaurice about his land and the plans for Defendant to reside on a separate piece of the property. Mr. Fitzmaurice explained that after the fire at his home, he was underinsured and thought his best bet was to pay off the mortgage so he would own the property. He planned to deed part of the land to Defendant, where she could live in a camper or

small home. He talked to the Probation Office, including Officer Welch, about the plan to run it by them. They said that "sounds wonderful" and "great, as long as [Defendant] is not 'down in the mix.'" Mr. Sharp asked if he took that to mean down near the other properties. He agreed, clarifying that it meant under the same roof or alone with his daughter.

He stated that the land he has cleared for Defendant to live on is about 200 or 300 yards away from the other campers and elevated from the full property, which is nearly ten acres and heavily wooded [Exh. pp. 4, 7, 13–15]. He only recently began working on the camper that will ideally be her permanent residence.

Mr. Sharp asked if he had any objection to Defendant living in the camper that is currently on the land and whether he could ensure that Defendant had no contact with his daughter, if the Court released her. He responded that Defendant has never been and will never be alone with his daughter; if he felt that Defendant was a danger, she would not be a part of his life. Mr. Sharp confirmed that he felt confident telling the Court that Defendant would not be around his daughter.

Mr. Fitzmaurice further testified that Defendant does not have much longer to live, and he wants to get her squared away and spend time with his child. With respect to Defendant's health, Mr. Fitzmaurice stated that Defendant is in end stage renal failure and has been on a dialysis "for a while now." Defendant is trying to get on a transplant list and has an appointment at the end of this month in Knoxville. She also attends therapy once a week.

Mr. Sharp also asked Mr. Fitzmaurice about his employment. He works for the Department of Veterans Affairs located in Johnson City though his work is across the region. While he works, his daughter is with her mother.

On cross-examination, AUSA Dale asked Mr. Fitzmaurice about the area of the property where Defendant could live [*Id.* at 15]. He asked: "You can see the other campers through the

trees, right?" Mr. Fitzmaurice responded that from where the camper is sitting in the photograph, you cannot see through trees. AUSA Dale questioned, "but you can get around them?" and Mr. Fitzmaurice responded that this would be more secluded than housing.

AUSA Dale next asked Mr. Fitzmaurice about what he could see while he was on the backhoe on May 27, and what he observed when Officer Welch and Defendant arrived at the property. Referring to the pictures of the property, Mr. Fitzmaurice explained that he was working on the deck and crushing things in the dumpster [*see id.* at 2]; his back was not to the driveway nor the shed. He reiterated that he saw Defendant drive up and Officer Welch was immediately behind her; Defendant cut towards the shed and around the yard then parked next to the barn, and Officer Welch pulled up and parked. He said his daughter went around the backside of the house, and he followed her around.

AUSA Dale inquired about Mr. Fitzmaurice's testimony that Defendant had never been alone with his daughter. He asked whether it would be a lie if she told Officer Welch that she had been alone with his daughter. Mr. Fitzmaurice stated that Officer Welch would not have had to reiterate that question in a text message and lie on the stand about it. AUSA Dale asked him to clarify whether he was saying that Officer Welch was lying on the stand and Mr. Fitzmaurice said, "He's lied in his report a few times. Yes, he lied on the stand."

On redirect, Mr. Sharp asked whether Mr. Fitzmaurice's testimony was how he believed the events of May 27, 2025, to be and if he was confident of this. He answered affirmatively to both questions.

III.   **POSITIONS OF THE PARTIES**

At the hearing, the Government argued that Officer Welch's testimony shows that probable cause exists to believe that Defendant violated three conditions of her supervised release.

Defendant disputed whether the evidence is sufficient to support a violation, and she took issue with the verbal instruction of her supervising officer.

If the Court finds probable cause, Defendant asks that she be released on conditions pending a revocation hearing, arguing that safeguards would ensure the safety of the community. The Government argued that Defendant should not be released nor allowed to have contact with children, and that the risk that Defendant's release poses cannot be mitigated.

## A. Preliminary Hearing[5]

AUSA Dale argued that Defendant's conditions of release not only restrict being alone with a minor, but also prohibit associating with a minor child. He asserted the word "associate" includes being at a residence where a minor child is. He highlighted Defendant's alleged comment of alarm and dismay upon Officer Welch's arrival and argued it indicates that she knew she was in violation. Additionally, he stated that Defendant was previously instructed that she could not be at the residence when the child was there. AUSA Dale stated that when Officer Welch investigated further, he found six other occasions that Defendant was around the child, including two times when she was at her brother's residence when no one besides the child was there.

Mr. Sharp argued that this case is about interpreting the language of the special condition. He maintained that Defendant was not alone or associating with the minor child on May 27, 2025, and there was no contact between them when Officer Welch came to the property. He further argued that if Defendant did make the oral statements to Officer Welch about the number of times

---

[5]   While the Court evaluates the issues relating to the preliminary hearing and the detention hearing separately, it considers the totality of the arguments for both issues in reaching its determinations as to probable cause and detention.

she was around the child, then there would be no need for the subsequent text message,[6] which he submitted was a confusing question to answer particularly given the emotion of the situation at the residence and Defendant's illness.[7] He called for application of the rule of lenity in light of the circumstances. In addition, he asserted that all conditions of supervised release must be in writing and that Officer's Welch's instruction that Defendant not be around the child was an oral instruction.

AUSA Dale argued in response that the issue is not whether Defendant had contact with the child, as there are many ways that a violation can occur without a hands-on offense, although that is the concern. Regarding the text message, he conceded the ambiguity in the question posed to Defendant over text but argued that Defendant's statement to Officer Welch that she had been entirely alone with the child on two occasions "is clear."

The Court inquired about the Government's position on the oral instruction Defendant received to not be on the property with the child. AUSA Dale answered that the written conditions require that Defendant follow all instructions of the probation officer. He argued that Officer Welch told her she could not be on the property when the child is present, and she violated the probation officer's instruction.

Mr. Sharp responded that the condition that Defendant not be alone or associate with a minor child is not a blank check for a probation officer to impose additional conditions. He argued that whether the written condition is clear is debatable, and the Court should resolve that ambiguity in favor of Defendant.

---

[6]     In this regard, Defendant questioned how well Officer Welch recalled the conversation with Defendant on May 27, but defense counsel made clear he was not accusing Officer Welch of presenting false testimony.

[7]     In this regard, Mr. Sharp presented information about Defendant's medical condition and her life expectancy.

### B.    Detention Hearing

Mr. Sharp argued that the Court should release Defendant on conditions, including that she live in a camper on her brother's property away from her brother's trailer. He asserted that when individuals are convicted of this type of crime (distribution and possession of child pornography), the law significantly restricts where they can live or work. He argued that there can be a knee jerk reaction to the potential harm that can arise, and here, the risk of harm has been mitigated. He stated that there is no evidence in the record that Defendant has committed any hands-on offenses, and the statement in her online profile is from 2012. He stated that she pleaded guilty quickly, took full responsibility, showed remorse, was in counseling while in custody of the Bureau of Prisons, and continues to attend counseling.

He proffered that the life expectancy for a female between the ages of forty-five and forty-nine under dialysis is 8.8 years. He stated that Defendant is on her third year of dialysis and has already been to the emergency room once while in custody. He stated that she receives $660 monthly in Social Security benefits and that her only family is Mr. Fitzmaurice. He asserted that that the trailer on the elevated level of the property can have electricity and water connected, is three hundred yards away from the other trailer, and Mr. Fitzmaurice stated he would ensure that Defendant had no contact with his daughter. He argued that with these safeguards in place, releasing Defendant and permitting her to attend counseling and treatment would ensure the safety of the community and allow her to access to necessary care.

AUSA Dale argued that Defendant "has shown herself unwilling to follow the most basic conditions" after receiving instructions and having an opportunity to ask for clarification, and that she "will attempt to mislead." He asserted that the child at issue is the same age and gender as those in the pornographic content for which she was convicted. With respect to the accusation that

15

Officer Welch lied on the stand, he argued that no evidence effectively controverts the testimony aside from the words of Mr. Fitzmaurice, who could lose custody of his child if Defendant is found to have violated the conditions.

As for Defendant's medical condition, AUSA Dale argued that Defendant's illness and shortened life expectancy may disincentivize her from complying with conditions of release. He argued that the best way for her to receive the lifesaving care she needs is to be in custody. He maintained that a three-year-old child cannot be put in danger in the process of speculating what these conditions mean.

Mr. Sharp replied, in turn, that the standard for detention does not ask the Court to consider an abundance of caution or the provision of medical care, and the law does not demand detention when there is any risk to any child.

## IV.    STANDARD OF REVIEW

Rule 32.1 of the Federal Rules of Criminal Procedure governs the revocation of supervised release. When a person is in custody for violating supervised, a magistrate judge must conduct a hearing to determine whether there is probable cause to believe that a violation occurred unless the individual waives the preliminary hearing. Fed. R. Crim. P. 32.1(b)(1)(A). If the magistrate judge finds probable cause for the violation, then the judge must conduct a revocation hearing. *Id.* § 32.1(b)(1)(C). In this context, "[p]robable cause exists when the Government presents 'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief' that the accused committed the violation of supervised release." *United States v. Garcia*, No. 4:08-CR-328-06, 2014 WL 12819401 (S.D. Tex. Sept. 23, 2014) (quoting *United States v. Lucio*, No. 5:06-MJ-930, 2006 WL 1663756, at *2 (S.D. Tex. June 13, 2006)).

Regarding detention, Rule 32.1 incorporates 18 U.S.C. § 3143(a)(1) and assigns the burden to the defendant. Fed. R. Crim. P. 32.1(a)(6). The rule provides that the Court must order detention unless the defendant establishes by clear and convincing evidence that she will not flee or pose a danger to the safety of any person or to the community if released. *United States v. McIntosh*, No. 02-CR-20049-02, 2012 WL 762614, *1 (E.D. Mich. Mar. 9, 2012) (observing that § 3143(a) "establishes a presumption in favor of detention that is rebuttable only upon the Defendant showing, by clear and convincing evidence, that he or she is not likely to flee or pose a danger to any other person or the community").

## V. PRELIMINARY HEARING

The Petition alleges that Defendant committed three violations of her terms of supervised release: (1) that she not commit another federal, state, or local crime; (2) that she truthfully answer all inquiries by the probation officer and follow the instructions of the probation officer; and (3) that she not associate and/or be alone with children under the age of 18, nor be at any residence where children under the age of 18 are residing, without the prior written approval of the probation officer [Doc. 41 p. 2]. Based upon the arguments and evidence presented, the Court finds probable cause exists to believe that Defendant violated two of the three conditions of her supervised release outlined in the Petition. In this regard, the Court observes that the probable cause standard is a low bar. *United States v. Tagg*, 886 F.3d 579, 585 (6th Cir. 2018) ("Probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" (citation omitted)); *United States v. Spencer*, No. 2:13-mj-129, 2013 WL 2417976, at *1 (S.D. Ohio June 3, 2013) (explaining that the probable cause burden is "low" (citation omitted)).

As for the condition that Defendant not violate another federal, state, or local law, the Petition alleges that Defendant violated 18 U.S.C. § 1001 and that she committed "multiple

violations of the Tennessee Sex Offender Registry requirements" [Doc. 41 p. 2].[8] Section 1001 provides that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined . . . [or] imprisoned not more than five years . . . ." 18 U.S.C. § 1001(a)(2). To commit this offense, a defendant must knowingly and willfully make a material statement or representation that was false or fraudulent and that statement must have pertained to a matter within the jurisdiction of one of the branches of the United States government. *United States v. Hills*, 27 F.4th 1155, 1186 (6th Cir. 2022) (citations omitted).

Here, Officer Welch arrived to conduct a home visit and observed Defendant in proximity to the minor child. As he entered the property, he initially observed no other persons around Defendant and the minor child. Officer Welch then exited his vehicle and asked Defendant about being alone with a child. She stated that she was not alone with a child. He then informed Defendant that he observed Defendant alone with a minor child, and she responded that she was alone with a child. It is possible Defendant truthfully answered both questions based upon the testimony of Officer Welch and Mr. Fitzmaurice. In answering the first question, Defendant answered that she was not alone with the minor child, perhaps because, at that specific time, the child had gone away with Defendant's brother following Officer Welch's arrival. In answering the second question, Defendant answered that she had been alone with the child, perhaps because her brother was on the backhoe before Officer Welch's arrival. The Court therefore finds that the

---

[8]     With respect to the violations of the Tennessee Sex Offender Registry, the Petition does not identify which part or parts of that law Defendant allegedly violated, and the Government did not articulate the basis for this allegation during the preliminary hearing. Given that, the Court declines to consider this secondary basis in its probable cause analysis.

Government has failed to show probable cause for the allegation that Defendant made a false statement in violation of 18 U.S.C. § 1001.

Turning to the condition that Defendant follow all instructions of her supervising officer, there is probable cause to believe Defendant violated this condition. Officer Welch instructed Defendant that she could not be at her brother's residence while his young child was present. When Officer Welch drove up, Defendant was within the curtilage of her brother's residence and the child was playing nearby. The undersigned finds probable cause to believe that Defendant violated this condition of supervised release.[9] Indeed, Defendant's response to seeing Officer Welch on May 27 suggests that she knew she was in violation of this condition.

As for whether there is probable cause to believe Defendant violated the condition that she not associate and/or be alone with children under the age of 18, nor be at any residence where children under the age of 18 are residing, without the prior written approval of the probation officer, the Court finds probable cause to believe Defendant violated this condition as well. Defendant argues that she did not "associate" with the child, nor was she "alone" with the child. While there may be some dispute about the meanings of "associate"[10] and "alone," Defendant's

---

[9]     Defendant argues that the instruction was not in writing and that the Court did not impose this as a condition. The question for the Court at this time, however, is whether there is probable cause to believe Defendant violated a condition of her supervised release. One of her conditions requires her to follow the instructions of her probation officer, and he testified that he instructed her to not be at her brother's residence when the minor child is present. There is no dispute she was at her brother's residence at the same time as the minor child on May 27, and she told him about other occasions.

[10]     The Sixth Circuit has found that "associate" in this context "means only to keep company with him." *United States v. Shultz*, 733 F.3d 616, 622 (6th Cir. 2013). The Sixth Circuit has also explained that this ban "cannot be interpreted to extend to absurd lengths, [and] only the defendant's physical proximity to children is restricted, and then only to the extent that such 'association' is not incidental.'" *United States v. Arnold*, 549 F. App'x 491, 498 (6th Cir. 2013). Based upon the information presented, the overall association here does not appear incidental.

19

statements to Officer Welch belie her assertion that she did not violate this condition. Defendant's brother testified that she was never alone with or around the child, but Defendant admitted in a statement against her interest that she had been at the residence while the minor child was there at least six separate times since April 11, 2025. She stated that on at least four of those occasions, the child stayed at the residence overnight, and she further stated that on at least two of those occasions, she was "totally alone" with the child.[11] And she confirmed via text message, albeit in response to a confusing, compound question, that she had been at the residence at the same time as the child.

Accordingly, the Court finds probable cause to believe that Defendant violated two of the three conditions of her supervised release set forth in the Petition.

## VI.    DETENTION HEARING

Proceeding under Rule 32.1, the Government asks the Court to detain Defendant pending his revocation hearing because she poses a danger to the community or another person. Defendant argues for release on the condition that she live in a camper on a piece of her brother's land.

A magistrate judge may release or detain a defendant charged with violating conditions of supervised release under 18 U.S.C. § 3143(a)(1). Fed. R. Crim. P. 32.1(a)(6). The statute provides that the judicial officer shall order a defendant detained unless the judicial officer finds by clear and convincing evidence that the defendant is not likely to flee or pose a danger to the safety of others or the community if released. 18 U.S.C. § 3143(a); *see also United States v. McIntosh*, No. 02–CR–20049–02, 2012 WL 762614, at *1 (E.D. Mich. Mar. 9, 2012) (observing that § 3143(a) "establishes a presumption in favor of detention that is rebuttable only upon the Defendant showing, by clear and convincing evidence, that he or she is not likely to flee or pose a

---

[11]    Even if Defendant was "intimidated" by Officer Welch, the specificity of these statements causes the Court to give them weight and credibility.

20

danger to any other person or the community"). The defendant bears the burden of showing that she will not flee or pose a danger to others or the community. Fed. R. Crim. P. 32.1(a)(6). In assessing the risks of flight and danger, the Court considers the factors set forth in 18 U.S.C. § 3142(g): the nature and circumstances of the alleged offense, the weight of the evidence against the defendant, a host of factors related to her history and characteristics, and the nature and seriousness of the risk of danger posed by her release. *United States v. Tolbert*, No. 3:09-CR-56, 2017 WL 6003075, at *4 (E.D. Tenn. Dec. 4, 2017) (instructing that § 3142 provides a framework to analyze release pending revocation hearing); *United States v. Holmes*, No. 3:98-CR-6, 2022 WL 4878591 (E.D. Tenn. Oct. 3, 2022).

The first factor examines the nature and circumstances of the alleged violations. 18 U.S.C. § 3142(g)(1). The nature and circumstances of the alleged violations are outlined above. They show that the Probation Officer instructed Defendant not to have any contact with her brother's minor child and that she not be at her brother's residence if the child is present there. Officer Welch observed Defendant and the minor child on the property at the same time on May 27. Defendant admitted to the Probation Officer that she had been in contact with the minor child at least six separate times since April 11, 2025. On at least four of those occasions, the child stayed at the residence overnight, and on at least two of those occasions, Defendant said that she was "totally alone" with the child.

The second factor examines the weight of the evidence of Defendant's dangerousness and risk of nonappearance. 18 U.S.C. § 3142(g)(2); *see also United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010) (observing that the second factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt."). As for the weight of evidence that Defendant poses a risk of danger, Defendant was convicted of distribution and

possession of child pornography in 2014. The Court has reviewed the offense conduct summary in the Presentence Investigation Report, which shows that Defendant presents a danger to the community. In her profile for an online account, Defendant stated: "I'm a closet pedo I guess you can say. I love pthc and can't seem to get enough" [SEALED Doc. 21 p. 5]. And while Defendant has not had any contact offenses, she has an admitted sexual interest in children, particularly children who are of the age of her brother's child.

The third factor focuses on the Defendant's history and characteristics. 18 U.S.C. § 3142(g)(3). Defendant is in dialysis for end stage renal disease and has an appointment this month about a kidney transplant. She receives $660 monthly in Social Security benefits and Mr. Fitzmaurice is her only source of family support. He has random visitation with his three-year-old daughter, and he would like to increase his visitation time with her.

The final factor looks to the nature and seriousness of the danger that would be posed by the defendant's release. 18 U.S.C. § 3142(g)(4). There is little question that distribution and receipt of child pornography is a danger to the community, particularly children. Here, Defendant presents a particular danger to her niece, who with some frequency stays on the same property as her.

Defendant argues that there are conditions that can alleviate any risks of danger that she may pose. She proposes that she be released to live in a camper in an isolated part of her brother's property and allowed to attend medical appointments and counseling. Additionally, her brother testified that he would ensure Defendant had no contact with his daughter. But the Court has doubts about Defendant's ability to abide by conditions of release. *See United States v. Cornish*, 449 F. Supp. 3d 681, 684 (E.D. Ky. 2020) ("[A]lmost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicated compliance with conditions imposed." (citation omitted)); *United States v. Green*, No. 5:21-CR-128,

2021 WL 6124486, at *6 (E.D. Ky. Dec. 28, 2021) (remaining unconvinced that conditions would assure community safety in light of the defendant's use of illegal substances and related offenses). Officer Welch directed Defendant not to be at her brother's property if the minor child was there. While Defendant disputes the appropriateness of this instruction, she undoubtedly disregarded it, as Officer Welch observed Defendant on the property at the same time as the minor child. Officer Welch also presented testimony that Defendant failed to keep him apprised of her residence when she had to relocate as a result of the fire that occurred at her brother's residence.[12] Due to her apparent inability to follow her Probation Officer's instructions, particularly those involving being around her brother's child, the Court doubts whether Defendant would now abide by additional conditions, if imposed.

Accordingly, the Court finds Defendant has failed to carry her burden of showing by clear and convincing evidence that she is not a danger to the community. Fed. R. Crim. P. 32.1(a)(6).

## VII.    CONCLUSION

For the reasons set forth herein, the Court finds probable cause to believe that Defendant violated two of the three conditions of her supervised release set forth in the Petition, specifically that Defendant (1) "answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer[;]" and (2)

> not associate and/or be alone with children under 18 years of age, nor shall he/she be at any residence where children under the age of 18 are residing, without the prior written approval of the probation officer. In addition, the defendant shall not visit, frequent, or remain *about any place that is primarily associated with children under the age of 18, or at which children*

---

[12]    One of Defendant's conditions of release is to notify her supervising officer at least ten days before changing her residence [Doc. 26 p. 3]. Officer Welch testified that when attempting to confirm the room number of the hotel where Defendant told him she was staying following the fire at her brother's residence, Defendant told him she had moved to a camper on her brother's property two weeks earlier. This is after Defendant moved into a hotel across from a high school and a day care when she told her supervising officer that she would be staying with her brother's girlfriend at the girlfriend's apartment.

23

> *under the age of 18 normally congregate, without the prior written approval of the probation officer.*

The Court also finds that Defendant shall be **DETAINED** pending revocation proceedings. The Court directs that Defendant be committed to the custody of the Attorney General or his/her designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; that Defendant be afforded a reasonable opportunity for private consultation with counsel; and, on order of a court of the United States or on a request of an attorney for the Government, the person in charge of the corrections facility in which Defendant is confined deliver Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

**IT IS SO ORDERED.**

ENTER:

Jill E. McCook
United States Magistrate Judge

24